J-A18042-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

IN RE: K.T.W.E. : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: E.E., FATHER :
:
:
:
:
:
:
: No. 333 WDA 2020

Appeal from the Order Dated February 4, 2020
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
O.A. No. 36 of 2019

IN THE INTEREST OF: K.T.W.E., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: E.E., FATHER :
:
:
:
:
: No. 334 WDA 2020

Appeal from the Order Entered February 4, 2020
In the Court of Common Pleas of Butler County Domestic Relations at
No(s): D.P. No. 89-2017

BEFORE: BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.: FILED NOVEMBER 2, 2020

E.E. (Father) appeals from the order granting the petition filed by the

Butler County Children and Youth Social Services (CYS) to involuntarily

terminate his rights to his minor child, K.T.W.E., born in May of 2016, pursuant

to the Adoption Act, 23 Pa.C.S. § 2511(a)(1),(2), (5), (8), and (b),[1] and the order changing the permanency goal from reunification to adoption.[2] After careful review, we affirm.

The trial court accurately summarized the facts of this matter as follows:

On September 18, 2017, the Butler County Children and Youth Services Agency (CYS) received a report from local law enforcement of an incidence of domestic violence with a child present. CYS Caseworker Michelle Womar responded to Mother's home. Mother confirmed the domestic violence incident, explaining that she was the victim of Father's assault. Mother confirmed that she had to climb out of a two-story window to escape Father at approximately 2:30 A.M. Mother had placed Child in a playpen prior to leaving through the window.

Upon Caseworker Womar's arrival, Father was no longer at the home, and Caseworker Womar had no interaction with him. Caseworker Womar observed the home to be appropriate. Mother had secured Child's safety, and she was an appropriate caregiver. Caseworker Womar indicated at this time that Child was healthy and that Mother was cooperative.

Mother filed a Petition for Protection from Abuse (PFA) [against Father]. A temporary PFA was granted on September 18, 2017. Father was charged by the police with assault and endangering the welfare of a child. Mother informed Caseworker Womar that Father made no attempts to physically harm Child. The matter was closed with CYS on September 22, 2017. Mother filed a Motion to Withdraw and Discontinue the PFA action, and the Temporary Order was dismissed on September 28, 2017. The Order of Court discontinuing the PFA action ordered the original

_____

[1] Mother filed a separate appeal from the order terminating her parental rights, which is docketed at 282 WDA 2020.
[2] Father filed separate appeals from both the permanency review order (334 WDA 2020) and the trial court's order terminating his parental rights (333 WDA 2020). This Court consolidated Father's appeals sua sponte on March 5, 2020. See Order, 3/5/20.

petition be forwarded to Butler CYS due to allegations in the petition of potential abuse or threat of abuse of a child.

On November 12, 2017, CYS again received a report from local law enforcement notifying CYS that Father had been arrested, Mother's whereabouts were unknown, and there was a child at the scene. CYS Caseworker Jonibeth Loverick and Caseworker Jessica Wagner went to the home. Upon their arrival, Child was with the police and was wearing only a diaper. The caseworkers noted that there was little food and only a few items for Child in the home. The home was in slight disarray, and there were pieces of plastic bags all over the floor near the couch. The police informed CYS that they were at the home based upon an anonymous tip that Father was at the address and had active warrants. The police also informed CYS that Father had barricaded himself in the home earlier, but he had voluntarily surrendered. Father was arrested, so there was no caretaker present for Child.

The police provided a phone number for Mother to CYS. Caseworker Loverick called the number and left a message for Mother. She also called and spoke to Maternal Grandmother, who reported that she did not know Mother's whereabouts. Caseworker Loverick inquired as to Maternal Grandmother's availability to be a placement, but based upon a prior criminal history and the emergent nature of the placement, Maternal Grandmother could not be a kinship placement at that time. She further explained to Maternal Grandmother that CYS would take further steps to determine if she was eligible for placement during normal business hours. Around 1:30 A.M., having not been able to locate Mother, CYS contacted this judge for an emergency placement. This judge found that it would be contrary to Child's welfare to remain in the home and that CYS had made reasonable efforts to prevent the removal and to find an adult relative or kin for placement. Mother finally contacted CYS after 4:00 A.M. when Caseworker Loverick was returning from placing Child with his first foster home. Caseworker Loverick explained the process to Mother. Paternal Aunt called CYS the following morning and discussed what steps she could take to become a kinship placement for Child. On November 13, 2017, this judge issued a written court order to memorialize the court's findings and verbal order. On that same date, CYS filed a Dependency Petition pursuant to 42 Pa. C.S. § 6302(1).

Caseworker Kayla Somerville-Carraher (who was, at the time, Kayla Somerville) received the case as the primary caseworker.

That same day, a Shelter Care Hearing was held before the juvenile court hearing officer. Father did not attend. Mother and Child were present. Mother was represented by counsel. A Guardian-Ad-Litem was present for Child. Father was assigned court-appointed counsel for the hearing. Father was present at the time of the hearing in another courtroom on criminal matters. The hearing officer found that Father has an extensive criminal history, and there was a history of domestic violence between Father and Mother. The hearing officer also found that Mother dropped the emergency PFA order on September 28, 2017, only a few days after it was issued. Mother also admitted to the caseworker that she used THC and Ecstasy. The hearing officer recommended the continued detention of Child and provided Mother with supervised visitation a minimum of three days per week for two hours per visit.

On November 14, 2017, Mother filed for and was granted a temporary PFA. On November 22, 2017, Nia Ellis (Paternal Aunt) was approved for a kinship placement subject to certification as a placement provider within 60 days. Child was placed with Paternal Aunt at both Father's and Mother's request. At the time of Father's request, Father was incarcerated. An Adjudication Hearing was scheduled for November 22, 2017. Father's counsel requested a continuance due to the Sheriff's Office being unable to transport Father for the hearing from the Butler County Prison. All parties consented to the continuance. The hearing was rescheduled for November 27, 2017. On that date, due to the late hour of starting the hearing and the requirement that the Sheriff have Father returned to the Butler County Prison by 4:30 P.M., the hearing was again continued.

Immediately prior to the Adjudication Hearing, Father made allegations, in a letter to CYS, claiming that Mother was a drug addict, had attempted to commit suicide on multiple occasions, drank too much alcohol, and was involved with CYS in Allegheny and Beaver Counties. He also stated that he did not feel that Child was safe with Mother and that Mother did not clean Child or change his diapers. Father claims now that he made all of the allegations up in an attempt to hurt Mother.

Following the Adjudication Hearing on December 19, 2017 and December 27, 2017, the hearing officer made findings of fact and found Child to be dependent pursuant to 42 Pa. C.S. § 6302(1). Mother and Father had a history of domestic violence incidents which involved the police. In September 2017, Father was

charged with aggravated assault, simple assault, child endangerment, and theft after Mother escaped from a physical confrontation with Father and she escaped by jumping out of a second floor window, leaving Child with Father until the police arrived. The assault charges were dismissed after Mother gave contradictory testimony that favored Father at the preliminary hearing.

In November [of] 2017, Father was arrested for trespass while at Mother's home. The police also found narcotics all over the residence. Child was found on the floor. Mother was not home at the time, but rather, was at a bar. Father admitted to drug and alcohol use and an extensive criminal history that included burglary. Father has anger issues, and he admitted that he and Mother fight a lot.

Ultimately, the hearing officer found facts supporting domestic violence, drug and alcohol use, anger issues, mental health issues, criminal histories, and lack of stability for Mother and Father. On January 22, 2018, a Dispositional Hearing was held. Prior to the hearing, Mother and Father participated in Family Team Meetings and participated in creating a Service and Visitation Plan. Mother's objectives were to maintain a sober lifestyle, maintain good mental health, and meet Child's basic needs. Father's objectives were to manage his anger with appropriate coping skills, maintain a sober lifestyle, and meet Child's basic needs.

On January 22, 2018, an indirect criminal contempt for violation of Mother's PFA was filed, with a final hearing held on January 30, 2018. Father was found in contempt and sentenced to one to six months of incarceration, and Father was to be on parole for the remainder of any time upon release. A Final PFA Order was entered January 30, 2018, to expire January 30, 2019.

On January 25, 2018, Child was removed from the kinship placement with Paternal Aunt because the certification service provider notified CYS that the Paternal Aunt's home could not be certified. Marcia Ellis, (Maternal Grandmother), did not pursue certification at that time. Child was then placed in the kinship home of Maternal Great-Grandmother at Mother's request. After only a month or two, Maternal Great-Grandmother reported [that she was] having vivid nightmares about Father and reported that she was afraid that Father would come and take Child away. She requested [that] Child be removed from her home. Again, on

March 9, 2018, Child was detained, and Child was placed in a confidential foster care.

On April 9, 2018, Father was arrested for violating the PFA again. Father admitted that he violated the PFA and was sentenced to six months of probation to run consecutive to the parole violation. Father's parole was revoked on the earlier violation.

A permanency review hearing was held on May 11, 2018. Mother had made moderate progress with the service plan. Father had made minimal progress, especially since he was incarcerated for violation of a PFA. Father had not participated in any services. On August 24, 2018, at a permanency review hearing, Mother had still made moderate progress with the service plan in that she was struggling to attend therapy. Father had still made only minimal progress. The same was true at the October 12, 2018 Permanency Review Hearing. Father did not appear at the hearing and had no contact with CYS since July 2018. Mother, however, had missed therapy sessions only due to work and was providing negative drug screens consistently. On or about November 12, 2018, CYS filed a motion for return of custody, which was granted. Child was returned to the custody of Mother on November 12, 2018 for an extended visit. At this time, Father was not participating in services. His last visit had occurred in July 2018. His only contact with Caseworker Laura Bathgate consisted of a voicemail where Father left no number for her to return his call.

Caseworker Bathgate testified that during the period of reunification, Mother's apartment was clean, Child was happy, and Mother was working. Mother was relieved of having to participate in drug and alcohol treatment at this time, but she was negative on one random drug screening. Mother was in mental health treatment. Child was in Mother's care for approximately two months.

On January 4, 2019, Mother called Caseworker Bathgate and stated that Father had been arrested at her apartment complex. Mother called because she was concerned that Father's arrest on the property would affect Child's placement with her. Mother hid the facts of the arrest from CYS. Father was arrested as an unauthorized tenant in Mother's apartment. The property manager and maintenance staff of the apartment complex saw Father on the property repeatedly. Father was arrested because he had active warrants.

At another indirect criminal contempt hearing in January 2019, Father admitted he violated the Final PFA Order again on January 4, 2019. Father was sentenced to two to six months of incarceration, with a period of parole for any time remaining after release. On January 10, 2019, Mother's Final PFA Order was extended to July 30, 2019.

Following Father's arrest at Mother's home, on January 8, 2019, Child was detained and placed in a new foster home. Following a Permanency Review Hearing on January 11, 2019, the court found that Father was on the premises of Mother's apartment as early as September, 2018, prior to the return of Child to Mother's custody and despite the PFA. Father was observed doing laundry, being in Mother's apartment, and socializing with employees. The landlord filed a complaint with the police. An incident occurred when the police located Father in Mother's apartment, and he fled by exiting a window, breaking the window screen and ultimately being tased by law enforcement and taken into custody, although Father disputes whether or not the window was broken and whether or not he was ever tased. Mother hid Father's activity in her home and their continued relationship. Mother had also failed to attend appointments for her mental health.

Caseworker Bathgate testified that the former foster care placement for Child was not willing to have Child returned to them because of concerns about their safety and Father. Child was placed in a new confidential foster home. The permanency plan for Mother and Father remained the same as prior to Mother's reunification with Child. At the time that Child was placed with the new foster family, Mother's visits began occurring at Totin Family Services. . . .

Another criminal contempt complaint was filed alleging that Father violated the Final PFA Order on June 22, 2019, and when Father failed to appear for the hearing on July 2, 2019, a bench warrant was issued for his arrest. Father was arrested and the bench warrant was lifted. Father was ordered to appear for the hearing on August 1, 2019. Father did not appear for the indirect criminal contempt hearing and Gagnon I [3] hearing, and a bench warrant was issued for Father's arrest. The indirect criminal contempt and Gagnon I hearings were dismissed after the hearing on August 8, 2019.

_____

[3] Gagnon v. Scarpelli, 411 U.S. 778 (1973).

On April 12, 2019, CYS filed a Petition to Involuntarily Terminate Parental Rights of Mother and Father pursuant to 23 Pa. C.S. §§ 2511(a)(1), (2), (5), and (8). CYS also requested a Preliminary Review Hearing with a goal change from reunification to adoption. The matters were consolidated for trial. Trial was held on October 1, 2019, October 2, 2019, and October 23, 2019.[4]

* * *

Father was incarcerated on and off during the time Caseworker Somerville-Carraher had the case. Father first visited CYS on December 11, 2017 after he was released from jail. CYS offered to set up visits with Child and Father at this time. Father had had no visits with Child prior to his release due to a Butler County Jail policy that does not permit visitation between children and incarcerated parents. Caseworker Somerville-Carraher reported that her conversations with Father were cordial, and Father understood what he needed to do to have Child returned to his care. Father was again incarcerated. When he was released March 7, 2019, he met with Caseworker Bathgate to discuss setting up services. Caseworker Bathgate gave him referrals for drug screening, anger management, and visitation with Child. Father began regularly attending visits with Child at that time, and Father began working with Specialty Outreach. Father started anger management and began drug screening in March or April 2019.

* * *

Caseworker Somerville-Carraher testified that while Child was placed with Paternal Aunt, Mother had to take two buses to get to her visits with Child, and as a result, Mother missed some visits.

_____

[4] At the hearing, Child was represented by a GAL, who argued in favor of termination. Father does not raise any issues relating to Child's right to separate legal counsel. See In re Adoption of K.M.G., 219 A.3d 662, 670, 676 (Pa. Super. 2019) (holding that (1) that "this Court's authority is limited to raising sua sponte the issue of whether the orphans' court violated Section 2313(a) by failing to appoint any counsel for the Child in a termination hearing," and (2) we may not "review sua sponte whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding" (citations omitted) (emphasis in original)).

Mother raised concerns that Paternal Aunt was doing drugs while caring for Child. Mother wanted Child removed from Paternal Aunt's care and placed with her mother and grandmother. Later, Mother said that it was her mother, Maternal Grandmother, who had a problem with Paternal Aunt being Child's placement.

Caseworker Bathgate received the case from Caseworker Somerville-Carraher. At the time, Child was still placed with Paternal Aunt. Paternal Aunt was working to complete the certification to be a kinship care placement for Child with Family Pathways. Caseworker Bathgate testified that in order to be certified, a placement has to complete the certification process within sixty days of starting it. On the forty-fifth day, Family Pathways called Caseworker Bathgate to inform her that they were concerned Paternal Aunt would not complete the certification process. Caseworker Bathgate called Paternal Aunt several times but was unable to reach her. Eventually, the sixty-day period ran, and Paternal Aunt had not completed the certification process. Caseworker Bathgate testified that she was not aware of other cases where a possible foster family had failed to complete the certification process within sixty days; however, Paternal Aunt had not completed several steps, including getting a license, completing FBI fingerprinting, contacting Family Pathways, and completing a physical exam of Child. Additionally, Caseworker Bathgate testified that for some period of time, Father was using Paternal Aunt's address, which would have precluded her from being a placement for Child. Paternal Grandmother testified that Father never lived at that address, but she was not aware of whether or not that address was used on any documentation.

Paternal Grandmother testified at the termination hearing that she was in the process of completing the paperwork to be certified as a placement as of October 23, 2019. She had never proceeded with the process before because she did not want to interfere, and she thought that Mother would get Child back. Paternal Grandmother noted that Mother "will be a good mother one day." However, Paternal Grandmother just started the certification process at the end of August 2019.

Mother has had problems with the current foster family. Child is biracial, and his foster parents are Caucasian. At visits, Mother or Father has braided Child's hair, which the foster parents would then remove very soon after the visit. However, Caseworkers and Dr. Bernstein noted that the foster parents have sought out resources to learn how to properly care for a biracial child,

especially in how to properly take care of Child's hair. Caseworker Tiffany Crotzer stated that the foster parents had indicated to her that they had removed the braids after Mother's visits because they were coming loose, Child was pulling them out, and they were getting matted and unclean. This court ordered the foster parents to stop removing Child's braids unless they had a legitimate reason, so the foster parents stopped touching Child's hair altogether. Then Mother complained to Caseworker Crotzer that Child's hair was dirty and unmaintained. Father has also raised some concerns regarding the differences in race between Child and foster parents, citing as an example that one of the foster parents' parent (foster grandparent) referred to Child's private parts as "black dingles" during bath time one night. Father was upset about the "black dingles" comment, but he admitted that he did not know in what context the comment was made. Father also stated that the few instances of Child's race being made an issue where not really problems for him, but he found it concerning that everyone else kept bringing up Child's race in relation to his foster parents.

Mother has alleged that Child told her that the foster parents were hitting him in the mouth and on the butt. Mother has called Childline to report abuse of Child with the current foster family. Mother alleges that Child was always covered in bruises, including an incident where Mother alleges that Child had a handprint bruise across his face, and that Child is not included in family activities. Mother alleges that foster parents told her that the marks on Child's face were mosquito bites.

However, Mother had also called Childline on the prior foster family. CYS Caseworker Olexsak testified that Mother has made numerous complaints about the prior and current foster parents, which she believed were made up. When Mother answered questions about the number of times that she made complaints of abuse by the foster parents, Mother was unsure of the number of times she made complaints, was unsure of when or what details she gave for each complaint, and was unsure of which foster parent she was alleging was responsible for a particular alleged injury. Further, Mother changed her testimony several times in relation to the alleged abuse.

Caseworker Olexsak testified that Father reported a handprint on Child's face in June 2019; however, Child indicated that the former foster parents were the ones who grabbed his face. Caseworker Olexsak testified that two reports were sent to Childline, which is

investigated by the regional office, and not the local CYS office. One report was made in June 2019 that Child had been hit in the eye and had blisters on his feet. The second report was made in August 2019. Both investigations were conducted by the regional CYS office, and not the local Butler CYS agency, and were returned as unfounded. Child alleged, to Mother, that the current foster mother had used a red spatula to hit him on the butt. During the investigation, Child alleged that Mother had used a red spatula to hit him on the butt. Caseworker Olexsak testified that the photos Mother sent to CYS about any alleged abuse did not warrant any investigation based on the photos themselves, which depicted minor injuries such as small bruises and an old, healing scab.

Notably, Child makes a lot of allegations to Mother when not in the presence of any other adult, and when Child is interviewed, Child says something different than what Mother alleges he said to her. Despite these concerns raised by parents, the caseworkers report that at the foster parents' home, Child shares a room with their biological children and is included in family activities. The foster parents' natural children get along with Child, and the foster parents have made, in Caseworker Crotzer's opinion, substantial efforts to understand and adjust to Child's hygienic and cultural needs.

As Caseworker Crotzer had only recently taken the case over in August 2019, Caseworker Bathgate testified that both Mother and Father were familiar with the objectives laid out in the service plan based on a meeting that she had with them. Mother's objectives were as follows: to maintain a sober lifestyle, maintain good mental health, and demonstrate an ability to meet Child's basic needs.

\* \* \*

Father's objectives were to developing coping skills to manage his anger appropriately, maintain a sober lifestyle, and demonstrate an ability to meet Child's basic needs.

To meet his objective of developing coping skills to manage his anger appropriately, Father had to sign releases of information with CYS and the anger management program to share information and participate in anger management until successful completion. Fourteen months after the goals were set and discussed with Father, Father began participating in anger

- 11 -

management in March 2019. Father began anger management one month before the Petition for Involuntary Termination of Parental Rights was filed. After several months, Father's first counselor stopped working for Specialty Outreach Services. Father was, then, assigned to a new counselor, who Father was not able to schedule appointments with consistently. Father was then assigned to a third counselor, who testified that he had only met with Father three times over two months, and he did not anticipate continuing to work with him because he thought Father would be reassigned to a different counselor. He stated that Father had missed one appointment and that he had not been able to reach Father for the two weeks prior to his testimony at the beginning of October 2019. He stated that Father was very early in treatment, and he would, realistically, need to meet with Father at least two times per week; unrealistically, he wanted to meet with Father every day. He was unsure of any progress that Father made with his prior counselor, but Father was not scheduled for any appointments in the future.

Father stated that every anger management counselor that he had been with had a different approach. Father found therapy helpful in that it helped him to reflect on all parts of his life. However, he admitted that he did not take the service plan seriously until the beginning of 2019, approximately a year and a half after Child was removed. Father stated that his intention was for Child to be with Mother, so he did not do what he should have done because he assumed Mother would do everything right. He said all he cared about was visitation, and he admitted that he was going around the systems set in place by seeing Child outside of his planned visitation schedule. Father admitted that he understood that if he had participated in the service plan, he could have been reunited with Child.

Father also demonstrated, through his testimony, his unwillingness to accept responsibility for the problems that he has had with anger. He testified that he did not know if the PFA Mother obtained was justified because he was not a judge, despite admitting that there were physical altercations between Mother and him. He stated that some of the violations of the PFA were "just text messages." He noted that he knew that if he was caught with Mother during the period that the PFA was active that it could affect Child's reunification with Mother, but he took that risk anyway because he thought that it would be viewed as him supporting Mother.

In order to demonstrate that Father was maintaining a sober lifestyle, Father had to complete a drug and alcohol assessment, follow all recommendations made pursuant to the assessment, submit to a minimum of two drug and alcohol screens per week and any requested random screenings, and provide any signed releases necessary for CYS and the provider to share information. Father was ordered by this Court to undergo drug screening at Family Pathways. According to CYS, Father was inconsistent in attending and was often positive for THC. Family Pathways employee, Elaine Lydon, testified that Father was referred for drug screenings on February 20, 2018, but Father completed only 9 out of 51 scheduled drug screens. Father's last drug screen at Family Pathways took place on July 12, 2018, but he remained on the schedule until November 7, 2018, so every missed appointment between July 12, 2018 and November 7, 2018 counted as a missed appointment. Five of Father's completed drug screens were positive for THC. Two had faint lines for cocaine but were considered negative. Father participated in drug and alcohol treatment at the Gaiser Center. Father completed outpatient treatment; however, Gina Mangone, a Gaiser employee, testified that Father had relapsed and had a positive drug test on the last day of the program. Because the test was a send-away drug test, Gaiser did not have the results of the final drug test when Father was marked as having completed treatment, and Ms. Mangone stated that she would not have marked Father as completed if she had had the results of the final drug screen on the final day of treatment. She could not, however, state what substance Father tested positive for. Father testified that the substance was THC. He stated that he had not obtained a card to use marijuana legally because it was too expensive and his insurance does not cover it. Father never provided a medical marijuana card. Father is not presently enrolled in any drug or alcohol treatment.

In order to demonstrate that he was able to meet Child's basic needs, Father needed to ensure that all of his household members and any potential caregivers were safe to be around Child, to maintain a legal source of income sufficient to meet Child's needs, obtain and maintain safe and stable housing with working utilities, and attend and actively participate in Child's medical appointments. Father indicated to CYS that, in 2018, he was working under the table. Since that time, Father has submitted no proof of employment or residence.

After he was released from incarceration, Father was referred to Family Pathways for visitation with Child in March 2018. Father

visited with Child frequently except when he was incarcerated. Father's visits with Child were appropriate, and Father and Child were always happy to see each other. Father testified that he was afraid that the foster parents would cut him completely out of Child's life because they do not want anything to do with him, which he felt would destroy Child.

After 18-19 months, none of the objectives were completed by Mother or Father. Child was removed in November 2017, and except for an extended visit from October 2018 until the beginning of January 2019, Child has been placed in kinship and/or non - kinship foster care. Caseworker Crotzer indicated that there is still a safety threat on the part of the agency because Mother has not addressed the problems with domestic violence, her mental health, and her unhealthy relationships. She also noted that Mother was arrested in August 2019 for public drunkenness for the third time this year, which demonstrated to her that Mother's behaviors are still not under control and Child is at a significant risk of instability.

Dr. Eric Bernstein conducted a bonding assessment for Mother and Child and Father and Child. The bonding assessment entailed a "combination of methodology from interviews; a review of the collateral information; to contact, of course, with the referral source, in this case CYF; observations; and when necessary, psychological testing, combined with a written report to reflect everything [he] learned." Dr. Bernstein also did an assessment of Child's interactions with the foster parents. Dr. Bernstein noted that the foster parents are intimidated by Father due to what they know about domestic violence between Father and Mother; however, they were open to post -adoption contact with Mother. Dr. Bernstein opined that Child fits in well with the foster parents and their biological children. Dr. Bernstein indicated that there were no problems with the interactions between the foster parents and Child. Dr. Bernstein noted that calling many people mommy and daddy can cause problems for a child, and the foster parents had redirected Child away from calling them Mommy and Daddy to calling them Mommy Katie and Daddy Ryan.

Dr. Bernstein conducted a clinical interview, the Personality Assessment Screener, and the Beck Depression Inventory for Mother and Father, which measures "for a wide range of personality factors from addition to psychopathology, depression, and anxiety." Mother acknowledged some depressive symptomatology. According to Mother's self-reporting on the BDI,

"she contended that she follows rules, respects authority. Minimized any history of rebelliousness. She essentially portrayed herself as a well-functioning adult, even despite the diagnoses of generalized anxiety disorder [. . .] and major depressive disorder." Father did not consider that he had any issue with anger or temper, despite acknowledging domestic violence and acknowledging being arrested between 10 and 20 times, with 4 arrests for felonies. By Father's report, he managed to control his moods and emotions.

Dr. Bernstein found the interactions between Mother and Child to be concerning. His main concern was regarding the way that Mother corrected Child about terms of reference for her and Father and for the foster parents. He stated that Mother told Child that she did not want Child calling the foster parents "mommy" and "daddy." He felt that Mother was using inappropriate pressure when Child is too young to appreciate the terms, which, to Child, would indicate shame and disapproval. Dr. Bernstein conducted a personality test on Mother, which was all based on Mother's self-reporting. Mother's answers did not match the reality of the situation, and he noted that Mother had a depressive tendency.

Dr. Bernstein raised concerns about whether or not Mother could keep Father away if they were not in a relationship, stating that based upon Mother's characterization of the situation, it raised concerns about whether she could establish safe boundaries against Father if he attempted to reconcile or re-enter her life. Dr. Bernstein expressed concerns that Child will begin to emulate Father's illegal activity.

Dr. Bernstein noted that Father is less than truthful. One example he cited is the letter that Father wrote accusing Mother of being a drug addict, which he then later retracted. Father described it to Dr. Bernstein as "over exaggerating a whole bunch of nonsense." Father self-reported no problems with anger or any emotional problems. Dr. Bernstein's final recommendation was that the foster parents offer a safe and stable home for Child, where there is an absence of violence or drama. While Mother and Father love Child and intend to meet his needs, they do not.

Ultimately, Dr. Bernstein opined that severing the bonds with parents, or foster parents, may result in harm to Child, stating "ultimately, he is likely to be negatively impacted not only by the separation from his parents but also the lack of future support as he grows and develops in need of their guidance and care.

Granted, however, if reunited with [Mother] or [Father], he is also at risk for compromise of his safety, well-being, and emotional health."

Dr. Bernstein supported terminating parental rights, testifying "weighing both the matter of reunification versus termination of parental rights, I support the court moving forward with the termination of both parents' rights and support the foster parents as an adoptive resource. No matter how the court decides, [Child] will likely be negatively impacted by the loss of an important bond with his parents or established safety and stability provided for by his foster parents. What tips the scale in favor of adoption is the clear potential for increased risk of compromise to [Child's] need for safety and stability if the court reunified him and his parents."

At Mother and Father's request, Dr. Beth Bliss completed a bonding assessment for Child and Mother and Child and Father limited to the existence of a bond between parents and Child and whether Child would be harmed if the parental relationship was terminated. This [c]ourt ordered that Dr. Bliss was permitted to include the foster parents if it would inform the above issues. Dr. Bliss indicated that she got some background information from the parents, including that Child was removed due to domestic violence issues. Dr. Bliss concluded that Child is "closely bonded" with Mother and Father. She observed that the interactions between Mother and Child and Father and Child were natural. Child often repeated Father and showed a strong desire to be like Father. Father and Child held hands and read books. Dr. Bliss testified that Child has a "strong and positive attachment" and a "strong and positive bond" with Father. Dr. Bliss' testified, in her opinion, that "if the bond were severed, that it could harm [Child]." Dr. Bliss stated that kids who move around frequently can develop Reactive Attachment Disorder, where they have difficulty forming healthy reactions to people or attachment to people. Dr. Bliss indicated that her "fear would be that in severing these bonds that he does have, that he could have difficulty in bonding or attaching to others later on."

Dr. Bliss noted that with Mother, Child often sought her out. Child called her mom and loves her. Child and Mother talked during the entire session; Child shared experiences with Mother, and they practiced shapes and animal sounds. The interactions were natural. In Dr. Bliss' opinion, Child is "closely bonded" with Mother, stating that he has a "strong, necessary, and important bond with [Mother]." Dr. Bliss opined that "it would be

psychologically harmful" if the bond between Mother and Child was severed. When questioned about the difference in her answers concerning whether it could or would harm Child, Dr. Bliss clarified that harm was one possible outcome. She further added that she did not know what would happen to a bond that Child might have formed with a foster parent if that relationship was severed.

Dr. Bliss did not perform any bonding between Child and the foster parents because she stated that it was not relevant to the questions posed by the [c]ourt. When asked if the bond between Mother and Child could have formed after Child was removed by virtue of their weekly visits, Dr. Bliss opined that a bond would likely form if Child spent two hours per week with any stranger but that it was unlikely that this level of bond would form solely from twice-weekly visits. She noted that Child's difficulty in transitioning between his parents and the foster parents was due to age-appropriate difficulties with separation, typical and normal for kids his age. Dr. Bliss noted that the extent of any harm that Child could face may be varied but that harm would likely still occur. Dr. Bliss did not review Dr. Bernstein's report and did not state any opinions as to Dr. Bernstein's methodology or opinions.

Trial Ct. Op. at 10-16, 20-24.

On February 4, 2020, the trial court issued an opinion and order granting CYS's petition to terminate Father's parental rights under Section 2511(a)(1),(2), (5), (8), and (b) and changing the goal to adoption. Father timely appealed and complied with Pa.R.A.P. 1925(a)(2)(i) and (b).[5]

Father raises the following issues on appeal:

1. Did the [trial c]ourt commit an error of law when it determined that [CYS] proved by clear and convincing evidence all the elements of 23 Pa. C.S. § 2511 (a)(1), (2), (5), and (8), thus justifying the termination of [Father's] parental rights?

_____

[5] As mentioned previously, Father filed separate appeals at the docket numbers for the goal change and the termination hearing. He also filed a simultaneous Rule 1925(b) statement preserving his instant claims.

2. Did the [trial c]ourt commit an error of law when it determined that the there was sufficient evidence to support a finding that the termination of parental rights served the best interest and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

3. Did the [trial c]ourt commit an error of law when it approved the Change of Goal from reunification to adoption for [Child] as recommended by [CYS]?

Father's Brief at 8.

### Claim That CYS Failed To Establish Grounds for Termination

In his first issue, Father argues that CYS failed to establish grounds for termination under Section 2511(a)(1), (2), (5), or (8). Id. at 14. Father asserts that "the initial concerns of [CYS] surrounded the alleged domestic violence between Mother and Father." Id. at 17. However, Father contends that "it is important to note that none of the PFA filings included [C]hild as a protected party" and there have been no allegations concerning Father's abuse of Child. Id. Further, he argues that although Father went "outside the system" to visit Child, "there were no allegations of violence between Mother and Father. When Father was arrested at Mother's apartment it was due to outstanding bench warrants, not due to any altercations between Mother and Father." Id. Father asserts that although he was "initially non-responsive to the family service plan, [] since his most recent release from incarceration, [he] has progressed rapidly through his goals" and "shown steady progress." Id. Specifically, Father notes that he has completed the drug and alcohol program and "very well could have completed [] his anger management if the service provider could provide a consistent counselor." Id.

CYS responds that the trial court properly terminated Father's rights under Section 2511(a)(1), (2), (5), and (8).[6]  CYS asserts that "over the course of the dependency case, Father was unable to demonstrate any substantial period of sobriety."  CYS's Brief at 16.  Further, CYS contends that Father did not have consistent employment, did not establish secure housing, and did not demonstrate any progress with anger management.  Id.  Overall, CYS argues that Father exhibited a lack of compliance with services.  Id.  CYS concludes that "[g]iven the length of the dependency case . . . and Father's failure to complete services, the [t]rial [c]ourt did not err in finding that [CYS] met by clear and convincing evidence the grounds for termination" of Father's parental rights.  Id. at 18.

In reviewing an appeal from an order terminating parental rights, we apply the following standard of review:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights.  As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  [In re R.J.T., 9 A.3d 1179, 1190 (Pa. 2010)].  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion.  Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

_____

[6] The GAL also filed a brief in support of terminating Mother and Father's parental rights to Child.  GAL's Brief at 12-24.

As we discussed in R.J.T., there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

In re Adoption of S.P., 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" Id. (citation omitted).

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 20 -

Further, we "may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." In re M.T., 101 A.3d 1163, 1179 (Pa. Super. 2014) (en banc) (citation omitted).

Initially, we review the trial court's ruling under Section 2511(a)(2), which provides:

§ 2511. Grounds for involuntary termination

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

*   *   *

(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the condition and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

- 21 -

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).

Further, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." In re Adoption of C.D.R., 111 A.3d 1212, 1216 (Pa. Super. 2015) (citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." In re A.L.D., 797 A.2d 326, 340 (Pa. Super. 2002) (citation and quotation marks omitted).

Here, the trial court addressed Section 2511(a)(2) as follows:

Father continues to be a safety threat to Child. He has not provided parental care, control or subsistence necessary for [Child's] physical or mental well-being in that he has not participated in services for the majority of the time that Child has been in placement. Father has participated minimally in anger management. Father started anger management right before the Petition for Involuntary Termination was filed, but he has made no progress. Father participated in drug treatment and tested positive for drugs on the last day of treatment. Father claims that he does not have problems with anger management or domestic violence, but Father completely lacks credibility based on his actions to deceive the [c]ourt. There is no record evidence that Father has ever parented Child without Mother's assistance. The conditions which caused Father's refusal or inability to parent Child continue to exist. Father cannot or will not remedy the situation which initially caused the dependency adjudication.

Trial Ct. Op. at 34.

Following our review, we find no abuse of discretion or error of law in the trial court's ruling that CYS established grounds for terminating Father's

parental rights under Section 2511(a)(2). See S.P., 47 A.3d at 826-27. As noted by the trial court, Father's progress with his service plan goals was minimal. See Trial Ct. Op. at 34; see also N.T. Trial, 10/1/19, 96-97; 100-105; N.T. Trial, 10/23/19, at 160-63. Father completed only nine out of the fifty-one scheduled drug screens, five of which were positive for THC. See N.T. Trial, 10/1/19, at 221, 223. Although Father attended some anger management therapy appointments, he did not begin treatment until fourteen months after the service plan goals were established. N.T. Trial, 10/23/19, at 128-31. Further, Father admitted that he had not taken his service plan goals seriously until 2019, approximately a year-and-a-half after Child was removed. Id. at 131. Father also failed to demonstrate that he was able to meet Child's basic needs, as he did not submit any proof of employment or residence. N.T. Trial, 10/1/19, at 148; N.T. Trial, 10/23/19, at 121. Finally, Father stated that he was "never really all the way compliant with the program aspect" of reunification. Id. He explained that his priority was to secure visitation rights, he wanted Child to remain in Mother's custody, and he did not complete his service plan objectives because he assumed that Mother would "do everything right." N.T. Trial, 10/23/19, at at 131-32.

Under these circumstances, the record contains no indication that Father made diligent efforts toward a reasonably prompt assumption of full parental responsibilities. See A.L.D., 797 A.2d at 340.

In sum, having reviewed the parties' arguments and the record, we find no basis to disturb the trial court's findings of fact, which were supported by

the record. Moreover, we discern no error in the trial court's legal conclusions that Father's repeated and continued incapacity to parent caused Child to be without essential parental care and that Father could not or would not remedy the incapacity. See C.D.R., 111 A.3d at 1216; M.E.P., 825 A.2d at 1272. As this Court has stated, "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." In re Adoption of R.J.S., 901 A.2d 502, 507 (Pa. Super. 2006) (citation and footnote omitted). Accordingly, we affirm the trial court's ruling to terminate Father's parental rights under Section 2511(a)(2). See S.P., 47 A.3d at 826-27.

Challenge To Trial Court's Conclusions Under Section 2511(b)

Father next argues that the trial court committed an error of law by concluding that termination would best serve Child's needs under Section 2511(b). Father's Brief at 21. Father asserts that "[t]he testimony from both Dr. Bliss and Dr. Bernstein supported a finding that there is an existing and beneficial bond between Father and [C]hild." Id. at 22. Father contends that although "[m]uch concern appears to be placed with the Father going outside the system to see his child," he "remained in contact with his son because he felt that he needed to support Mother in her capacity of raising the child." Id. at 23. Father claims that "[h]e has had a strong relationship with [Child] since he was born," which is "highlighted in the visitation reports" and "further supported by both Dr. Bliss and Dr. Bernstein in their reports and testimony to the [c]ourt." Id. at 23-24. Father argues that his bond with Child "is even

further heightened by the fact that [C]hild was visiting with the parents or an extended family member almost every day of the week" and that Child was only spending nights with his foster parents. Id. at 24. Father concludes that "[t]erminating the bond between Father and Child will have devastating and an everlasting impact on this child and is not in his best interest." Id.

CYS responds that "[w]hile there is an appearance of a bond between Father and Child, there was little evidence that this bond was positive and/or strong." CYS's Brief at 22. Nonetheless, CYS contends that despite the bond between Father and Child, "Child's need for safety, stability, and permanency outweigh any potential harm to [] Child in severing [] Father's parental rights." Id.

Section 2511(b) states:

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but the focus of Section 2511(b) is on the child. See In re C.L.G., 956 A.2d 999, 1008 (Pa. Super. 2008) (en banc). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In In re E.M., 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (some citations omitted).

Nonetheless, the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, as "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." Id. at 267 (citation omitted). Further, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." Id. (citation and footnote omitted).

In evaluating a child's best interests, the court may emphasize the safety needs of the child. In re K.Z.S., 946 A.2d 753, 763 (Pa. Super. 2008) (affirming involuntary termination of parental rights, despite the existence of some bond, where placement with mother would be contrary to the child's best interests); see also In re Adoption of J.N.M., 177 A.3d 937, 946 (Pa. Super. 2018) (citation omitted) (reiterating that the detrimental effects of severing a parent-child bond could be outweighed by the need for safety and

security). As this Court has noted, "a parent's basic constitutional right to the custody and rearing of . . . [his] child is converted, upon the failure to fulfill . . . [his] parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Nonetheless, "[w]hen examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'" J.N.M., 177 A.3d at 944 (citation omitted). "In the case of an unhealthy bond, 'attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact.'" Id. (citing T.S.M., 71 A.3d at 267).

Here, the trial court addressed Child's best interests under Section 2511(b) as follows:

> Both Dr. Bliss and Dr. Bernstein noted that terminating the parental bonds between Child and his parents could harm Child. Despite that, Dr. Bernstein supported termination of parental rights to Child because of several concerns that he raised, including Mother's ability to keep Child safe from Father and Father's propensity to be less than truthful in dealing with his ongoing problems with anger and domestic violence. Despite a possible negative impact on Child from the separation from his parents, Dr. Bernstein still supported termination of parental rights because, in his opinion, Child's safety and stability

outweighed the potential for speculative harm caused to Child by severing the bonds with Mother and Father. This is demonstrated in Dr. Bernstein's testimony that in "weighing both the matter of reunification versus termination of parental rights, [Dr. Bernstein] support[s] the [c]ourt moving forward with the termination of both parents' rights and support[s] the foster parents as an adoptive resource. No matter how the [c]ourt decides, [Child] will likely be negatively impacted by the loss of an important bond with his parents or established safety and stability provided for by his foster parents. What tips the scale in favor of adoption is the clear potential for increased risk of compromise to [Child's] need for safety and stability if the [c]ourt reunified him and his parents."

Dr. Bliss, pursuant to the [c]ourt order that permitted her to conduct the bonding assessment between Mother and Father and Child, did not address whether the bond was outweighed by a need for safety, stability, and permanency. Dr. Bliss' only inquiry was into whether or not a bond existed and what possible harm could occur from a severance of the bond. She testified that harm was one possible outcome of severing the bonds. Dr. Bliss did not opine on whether or not parental rights should be terminated and was not even aware of most of the background information, preferring, by her own testimony, to avoid collateral information that might bias her opinion of whether or not severing the bond might harm Child. Further, Dr. Bliss never reviewed Dr. Bernstein's report, and she did not testify that any protocol used by Dr. Bernstein was inappropriate. Dr. Bliss did not testify as to how Child's bond with the foster parents may mediate any harm experienced by Child from termination of the bond with his parents.

As agreed by Dr. Bliss and Dr. Bernstein, there is a possibility of harm to Child if his bonds with Mother and Father were severed. However, Dr. Bernstein noted, and this [c]ourt agrees, that the risk to safety and stability faced by Child if he is reunited with Mother and Father outweighs the potential for harm if the bonds are severed.

Child is bonded with Mother and Father. Mother and Father love Child, and Child loves them. Child looks to Mother and Father for love. On visits, they play together and talk about things. The one thing that Mother and Father have consistently done since Child was detained is maintain their relationship with Child. However, "the mere existence of a bond or attachment of a child to a parent

will not necessarily result in the denial of a termination petition." T.S.M., 71 A.3d at 267. Stability and family permanence are critical to the health and welfare of dependent children and must take priority.

Despite Mother and Father's bonds with Child, Child's need for safety, stability, and permanency outweigh any potential harm to [Child] from the severing of Father's parental rights. Father made no effort to participate in services until March 2019, one month before the filing of the Petition for Termination and sixteen months after Child's initial removal. Even considering that Father started anger management in March 2019, there is nothing to indicate that he has made any progress. He has had to change therapists several times, and his current therapist did not anticipate working with him again, partially due to the fact that Father had missed an appointment and not answered phone calls for the three weeks prior to the involuntary termination hearing. Father admitted that he was expecting Mother to participate and get Child back so that he did not have to do anything to obtain custody of Child. Father did not participate in drug screenings, and when he did participate in treatment, he tested positive for drugs on the last day of the treatment program. Father never submitted any proof of residence or employment.

\* \* \*

Worse than Mother and Father's failure to comply with the service plan is Mother and Father's lying and deceptive behavior designed to circumvent the [c]ourt's orders, placing Child at great risk of harm. Both have repeatedly demonstrated an intent to sidestep the safety measures in place to protect Child, putting their own desires before Child's safety.

Child has been involved with CYS for approximately two years of the three years and a half years since his birth, while Mother and Father have made no progress and continue to place Child at risk of harm. Child needs to be safe and stable above all else. Safety, permanency, and the well-being of Child "must take precedence over all other considerations." In re S.B., 943 A.2d 973 (Pa. Super. 2008). Mother and Father's inability or unwillingness to remedy the problems that continue for them, most specifically the domestic violence and drug and alcohol problems, cause it to be in the best interests of Child to have parental rights terminated so that Child can find safety, permanency, and stability.

In this case, the parents have spent a lot of time comparing themselves to the foster parents; however this is not the standard in an involuntary termination of parental rights case that involves agencies. Trial courts should pay the utmost attention to discerning the effect on Child of permanently severing parental bonds; however, the Adoption Act specifically provides that a pending adoption is not a prerequisite to terminations of parental rights that involve agencies like CYS. In re T.S.M., 71 A.3d at 267. This court understands that best practice is to have a stable and permanent family if parental rights are terminated, and the court may consider a child's bond with his or her foster parents. This court has given consideration to Child's bond and interactions with the foster parents in so far as it affects the developmental, physical and emotional needs and welfare of Child; however, this court has not, and will not, engage in a comparison of foster parents and natural parents. The safety, permanency, and stability of Child is the paramount concern.

\* \* \*

Mother and Father have raised the failure to place Child in a kinship home with Paternal Aunt or Paternal Grandmother. The ability or inability to be placed in a kinship home is not relevant to a termination proceeding. The court acknowledges that it is best practice in a dependency action to place a child in kinship care when possible and can consider this when considering the needs and welfare of a child. Unfortunately, in this case, neither Paternal Aunt nor Paternal Grandmother completed the certification process. There is no evidence that this was the result of CYS['s] action or inaction. Paternal Grandmother testified that she did not start the process timely because she assumed that Mother would get Child back. This appears to be a common presumption in Father's family. While the Paternal family waited for Mother to do everything right, they took little to no action. At best, Child was not placed with Father's family because of a lack of follow through. Regardless of how unfortunate it is, this is the factual scenario that the court is left with due to the inaction of Father's family in completing or starting the certification process.

In summation, this court recognizes that, regrettably, Child may suffer some grief and loss with the termination of rights of his parents and the termination of relationship with Father's extended family. However, after nearly two years of providing opportunities

for reunification, the court must ultimately meet Child's best interest by ensuring a safe, stable, and permanent home for Child.

Trial Ct. Op. at 40-45.

Based on our review of the record, we discern no basis to disturb the trial court's finding that termination of Father's parental rights would best serve Child's needs and welfare. See T.S.M., 71 A.3d at 267. The trial court acknowledged the existence of a bond between Father and Child and the fact that Child may suffer grief or loss if that bond were severed. Trial Ct. Op. at 43; see also N.T. Trial, 10/2/19, at 71. However, as noted by the trial court, Father "continues to be a safety threat to Child" and "has not provided any parental care, control, or subsistence necessary for [Child's] physical or mental well-being." Trial Ct. Op. at 34; see also N.T. Trial, 10/1/19, at 148; N.T. Trial, 10/23/19, at 121. Therefore, the trial court properly concluded that any detriment Child may suffer from severance of his bond with Father was outweighed by Child's need for safety, stability, and permanency. See J.N.M., 177 A.3d at 944; see also B., N.M., 856 A.2d at 856; see also K.Z.S., 946 A.2d at 763.

Under these circumstances, we discern no abuse of discretion by the trial court in applying Section 2511(b). See S.P., 47 A.3d at 826-27. Clear and convincing evidence supports the trial court's conclusion that termination of Father's parental rights would best serve Child's developmental, physical, and emotional needs and welfare. See R.N.J., 985 A.2d at 276. Accordingly, we affirm.

Challenge To Goal Change From Reunification To Adoption

In his remaining issue, Father argues that the trial court committed an error of law by approving the goal change from reunification to adoption. Father's Brief at 24. Specifically, Father contends that "there was no evidence that touched on the [required] factors" and that "the main rationale behind the goal change was the fact that the [c]ourt issued an order terminating Father's parental rights." Id. at 25. Father also asserts that "there was no analysis as to how any of the evidence fit into the standards" for evaluating a goal change petition, and therefore, this Court should "vacate the order terminating parental rights[, as] it would likewise vacate the order changing the goal to adoption." Id.

CYS does not address this issue in its brief. However, the GAL asserts that Father "misunderstands the application of [the goal change] factors" and that there was overlapping evidence to support both termination and the goal change to adoption. GAL's Brief at 15. Further, the GAL notes that the goal change was necessary in light of the trial court's conclusions regarding termination and Child's need for safety and stability. Id. at 16.

It is well settled that "goal change decisions are subject to an abuse of discretion standard of review." In re R.M.G., 997 A.2d 339, 345 (Pa. Super. 2010) (citation omitted).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings

of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

Id. (citation omitted).

Pursuant to Section 6351(1) of the Juvenile Act, when considering a petition for a goal change, the trial court must consider the following factors: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. 42 Pa.C.S. 6351(1); see also R.J.T., 9 A.3d at 1185 n.8.

The best interests of the child, and not the interests of the parent, must guide the trial court's decision. S.B., 943 A.2d at 978. We have stated that "[t]hese statutory mandates clearly place the trial court's focus on the best interests of the child." Id. (citation omitted). "Although the agency has the burden to show a goal change would serve the child's best interests, 'safety, permanency, and well-being of the child must take precedence over all other considerations' under Section 6351. 'The parent's rights are secondary' in a

- 33 -

goal change proceeding." R.M.G., 997 A.2d at 347 (citations omitted and formatting altered).

Here, the trial court issued a permanency review order with its findings of fact. See Permanency Review Order, 2/4/20. Therein, the trial court stated that Child's placement with foster family was necessary and appropriate, CYS had made reasonable efforts to finalize Child's permanency plan, and Child was safe with his foster family. Id. Further, the trial court indicated that the goal change to adoption was appropriate because it was "best suited to the protection and physical, mental and moral welfare of the child." Id.

In its Rule 1925(a) opinion, the trial court thoroughly addressed Mother and Father's limited compliance with the service plan and their lack of progress towards remedying the circumstances that led to Child's placement. Trial Ct. Op. at 29-43. The trial court also addressed Mother's and Father's failure to complete their respective goals for reunification. Id. at 43; see also N.T. Trial, 10/1/19, at 148; N.T. Trial, 10/23/19, at 121. The trial court explained that "after nearly two years of providing opportunities for reunification, the court must ultimately meet Child's best interest by ensuring a safe, stable, and permanent home for Child." Trial Ct. Op. at 45. Further, the trial court stated that it considered Child's bond and interactions with his foster family in the context of Child's "developmental, physical and emotional needs and welfare," and again emphasized that "the safety, permanency, and stability of Child is the paramount concern." Trial Ct. Op. at 44; see also N.T. Trial, 10/2/19, at 71.

In sum, the record reflects the trial court's consideration of the factors supporting the goal change, as well as the trial court's emphasis on Child's best interests and his need for safety and stability. See S.B., 943 A.2d at 978. Under these circumstances, we find no abuse of discretion or error of law in the trial court's conclusion that the goal change to adoption was appropriate. See R.M.G., 997 A.2d at 345. Therefore, Father is not entitled to relief on this issue.

Accordingly, for the foregoing reasons, we affirm the termination of Father's parental rights to Child and the change of Child's permanency goal to adoption.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/02/2020